UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X

MATTHEW W. SOLTIS,                      :

                    Plaintiff,     :    18 Civ. 0490 (HBP)

    -against-                           :    OPINION
                                             AND ORDER
NANCY A BERRYHILL,                      :
Commissioner of Social Security
                                        :
                    Defendant.
                                        :
-----------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/25/19

PITMAN, United States Magistrate Judge:

## I.  Introduction

        Plaintiff Matthew W. Soltis brings this action pursuant
to section 205(g) of the Social Security Act (the "Act"), 42
U.S.C. § 405(g), seeking judicial review of a final decision of
the Commissioner of Social Security (the "Commissioner"), denying
his application for supplemental secure income ("SSI") and
disability insurance benefits ("DIB").  All parties have con-
sented to my exercising plenary jurisdiction pursuant to 28
U.S.C. § 636(c).  Plaintiff and the Commissioner have both moved
for judgment on the pleadings pursuant to Rule 12(c) of the
Federal Rules of Civil Procedure (Docket Item ("D.I.") 13, 16).
For the reasons set forth below, the Commissioner's motion for
judgment on the pleadings is granted, and plaintiff's motion is
denied.

II.  Facts[1]

  A.  Procedural Background

          On May 7, 2014, plaintiff filed an application for SSI
  and DIB, alleging that he became disabled on January 1, 2011 due
  to autism spectrum disorder,[2] executive dysfunction,[3] epilepsy[4]

  _____

          [1]I recite only those facts relevant to my resolution of the
  pending motions.  The administrative record that the Commissioner
  filed pursuant to 42 U.S.C. § 405(g) (see Notice of Filing for
  Administrative Record, dated Apr. 25, 2018 (D.I. 10) ("Tr.") more
  fully sets out plaintiff's medical history.

          [2]Autism spectrum disorders refer to pervasive developmental
  disorders "characterized by impairment of development in multiple
  areas, including the acquisition of reciprocal social
  interaction, verbal and nonverbal communication skills, and
  imaginative activity and by stereotyped interests and behaviors;
  included are autistic disorder, Rett syndrome, childhood
  disintegrative disorder, and Asperger syndrome."  Dorland's
  Illustrated Medical Dictionary, at 549, 552 (32nd ed. 2012)
  ("Dorland's").

          [3]Executive dysfunction refers to difficulties in the areas
  of concentration, remembering information, time management,
  organization and multitasking.  Obsessive compulsive disorder and
  autism can cause executive dysfunction symptoms.  Executive
  Dysfunction, Healthline, available at https://www.healthline.com/
  health/executive-dysfunction (last visited Mar. 18, 2019).

          [4]Epilepsy is a central nervous system disorder in which
  brain activity becomes abnormal, causing seizures or periods of
  unusual behavior, sensations and occasional loss of awareness.
  Seizure symptoms can vary widely; some individuals with epilepsy
  simply stare blankly for a few seconds during a seizure, while
  others repeatedly twitch their arms or legs.  Epilepsy is
  commonly treated and controlled with medication.  Epilepsy, Mayo
  Clinic, available at https://www.mayoclinic.org/diseases-
  conditions/epilepsy/symptoms-causes/syc-20359993 (last visited
  Mar. 18, 2019).

and anxiety (Tr. 101). After his application for benefits was initially denied on October 7, 2014, he requested, and was granted, a hearing before an administrative law judge ("ALJ") (Tr. 114-29).

On September 9, 2016, plaintiff and his attorney appeared before ALJ Robert Gonzalez for a hearing, at which plaintiff and a vocational expert testified (Tr. 37-100). On January 13, 2017, the ALJ issued his decision finding that plaintiff was not disabled (Tr. 18-30). This decision became the final decision of the Commissioner on December 18, 2017 when the Appeals Council denied plaintiff's request for review (Tr. 1-6). Plaintiff timely commenced this action on January 19, 2018 seeking review of the Commissioner's decision (Complaint, dated Jan. 18, 2018 (D.I. 1) ("Compl.")).

B. Social Background

Plaintiff was born on February 13, 1992 and was 18 years old at the time he filed his application for SSI and DIB (Tr. 186, 190). Plaintiff started experiencing petit mal sei- zures[5] when he was approximately four years old and was diagnosed

---

[5]Petit mal seizures, or absence seizures, are a type of generalized seizure that commonly occur in children and are characterized by staring into space or subtle body movements, such as eye blinking or lip smacking. Epilepsy, Mayo Clinic, available at https://www.mayoclinic.org/diseases-conditions/epilepsy/symptoms-causes/syc-20359993 (last visited
(continued...)

with Asperger Syndrome ("Asperger's")[6] when he was five years old
(Tr. 386).

During high school, plaintiff worked at a local library
where his main responsibilities were helping patrons find books,
organizing and stocking (Tr. 51). Plaintiff also held a seasonal
job as tour guide at a historical site (Tr. 52-53). Plaintiff
testified that this job presented some difficulties for him
because he had trouble communicating with his supervisors and did
not always understand or follow his supervisor's instructions
(Tr. 77-89).

Plaintiff graduated from Mount Saint Mary College in
2015 with a Bachelor of Arts degree in history; his cumulative
grade point average was 3.14 (Tr. 40, 45). Plaintiff testified
at the hearing that he lived on campus throughout his time at
Mount Saint Mary's, but that it was a difficult transitional
period for him (Tr. 41-43). Plaintiff further testified that
Mount Saint Mary provided him with services, such as counseling
and additional time and low-distraction locations to take exams

---

[5](...continued)
Mar. 18, 2019).

[6]Asperger's is a pervasive developmental disorder and is
often considered "high functioning autism." The main symptoms of
Asperger's include limited reciprocal social interaction,
repetitive behaviors and above average intelligence in the areas
of numbers, math, computers and music. Asperger Syndrome,
Cleveland Clinic, available at https://my.clevelandclinic.org/
health/diseases/6436-asperger-syndrome (last visited Mar. 18,
2019).

(Tr. 45-46). During college, plaintiff was an active member of the track and field team, was the president of the political awareness club and helped start the poetry club (Tr. 41-42, 47-48).

In his "Function Report", dated September 1, 2014, plaintiff described his typical day as getting up, showering, eating, going to class, doing homework and participating in his hobbies, such as running, watching movies, listening to music, collecting stamps and coins, studying history and working with radio control airplanes (Tr. 244, 247). Plaintiff stated that he was unable to obtain a driver's license or operate a motor vehicle because of his Asperger's and epilepsy (Tr. 245). Plaintiff further stated that he was able to dress himself, but sometimes would wear clothes that were inappropriate for the weather (Tr. 245). Plaintiff reported that he had difficulties taking his medication on time (Tr. 246). He reported difficulty with cooking and preparing meals, so he always ate his meals in the school cafeteria and relied on his father to make his meals when he was home from school (Tr. 246-47). Plaintiff also reported difficulty with handling money and paying bills due to his illnesses (Tr. 247). Plaintiff stated that he socialized daily, but sometimes had issues being accepted by his peers because of his Asperger's and that he had trouble finding a girlfriend (Tr. 248). Plaintiff claimed that he had difficulty

dealing with authority figures, but that he had never lost a job because of it (Tr. 250).

On July 8, 2016, plaintiff starting working four days a week at West Point Prep School as a food server (Tr. 53-54). Plaintiff stated that he was usually assigned tasks at that job by a supervisor and then worked with two other food service workers to complete the task (Tr. 55-56). Plaintiff was still working in that position as of the date of the hearing (Tr. 53-54). He testified that he enjoyed his position and was doing well because the job provided him with structure (Tr. 83).

## C. Medical Background

### 1. Medical Records Pre-Dating the Relevant Time Period

#### a. Dr. Ronald I. Jacobson

Plaintiff started seeing Dr. Ronald I. Jacobson, a neurologist, when he was two years old (Tr. 414). During his initial assessment on September 20, 1994, Dr. Jacobson opined that plaintiff did not have autism, but exhibited anxious, obsessive behaviors and had some features of a central language processing disorder (Tr. 414-15).

During plaintiff's next two appointments on December 13, 1994 and February 13, 1995, plaintiff continued to exhibit obsessive behaviors, such as repetitive opening and closing of

doors (Tr. 412-13). Dr. Jacobson diagnosed plaintiff with obsessive compulsive disorder ("OCD")[7] and a central language processing disorder, and recommended that he start a low dose of Prozac[8] (Tr. 412-13). Plaintiff's obsessive behaviors improved over the next several months with medication and therapy (Tr. 408-11).

On December 5, 1996, Dr. Jacobson noted plaintiff was developing more pervasive development disorder type features and that he had difficulty maintaining related and appropriate speech during conversation (Tr. 407). Dr. Jacobson recommended slowly increasing plaintiff's Prozac dosage and behavioral modification therapy (Tr. 407). On December 31, 1996, Dr. Jacobson sent plaintiff's parents a letter addressing their concern that plaintiff might have Asperger's (Tr. 406). Dr. Jacobson acknowledged that it was certainly possible that plaintiff suffered from Asperger's, but that he was still too young for a definitive diagnosis (Tr. 406).

---

[7]OCD features a pattern of unreasonable thoughts and fears that causes individuals to do repetitive behaviors, which can interfere with daily activities and cause significant distress. Obsessive-Compulsive Disorder (OCD), Mayo Clinic, available at https://www.mayoclinic.org/diseases-conditions/obsessive-compulsive-disorder/symptoms-causes/syc-20354432 (last visited Mar. 18, 2019).

[8]Prozac, or fluoxetine, is an antidepressant used to treat depression, OCD and panic disorder. Fluoxetine, Mayo Clinic, available at https://www.mayoclinic.org/drugs-supplements/fluoxetine-oral-route/description/drg-20063952 (last visited Mar. 18, 2019).

The next record from Dr. Jacobson is from an examina-
tion of plaintiff on July 6, 2000 (Tr. 404). Plaintiff's parents
reported that plaintiff was experiencing episodes in which he
stared, turned his head and exhibited eye fluttering for
approximately three to five minutes (Tr. 404). Dr. Jacobson
opined that plaintiff was likely experiencing brief complex
partial seizures[9] and recommended that plaintiff undergo an
electroencephalography ("EEG")[10] (Tr. 404).

Plaintiff did not visit Dr. Jacobson again until June
27, 2003 (Tr. 403). Plaintiff's parents reported that plaintiff
had not experienced any seizures since December 2000 (Tr. 403).
Plaintiff was taking Zarontin[11] to control his seizures (Tr.

---

[9]Complex partial seizures are a type of focal seizure that
commonly involve a change or loss of consciousness or awareness,
staring into space or repetitive movements, such as hand rubbing,
chewing, swallowing or walking in circles. Epilepsy, Mayo
Clinic, available at https://www.mayoclinic.org/diseases-
conditions/epilepsy/symptoms-causes/syc-20359993 (last visited
Mar. 18, 2019).

[10]EEG is the main diagnostic test used for diagnosing
epilepsy. Electrodes, or small cup-shaped disks, are attached to
the patient's head and connected by wires to an electrical box
that records the electrical activity of the brain. Abnormal
brain electrical activities or patterns can indicate epilepsy or
a number of other conditions. EEG, Epilepsy Foundation,
available at https://www.epilepsy.com/learn/diagnosis/eeg (last
visited Mar. 18, 2019).

[11]Zarontin, or ethosuximide, is an anticonvulsant oral
medication used to control petit mal seizures. Ethosuximide,
Mayo Clinic, available at https://www.mayoclinic.org/drugs-
supplements/ethosuximide-oral-route/description/drg-20072587
(last visited Mar. 18, 2019).

403). Dr. Jacobson noted that plaintiff was exhibiting some symptoms of Asperger's and mild social difficulties (Tr. 403).

Plaintiff visited Dr. Jacobson again on September 3, 2004 and remained seizure-free (Tr. 402). Dr. Jacobson recommended that plaintiff continue to take Zarontin (Tr. 402). On April 19, 2004, plaintiff's mother reported that plaintiff was experiencing some increased staring episodes (Tr. 401). Dr. Jacobson increased plaintiff's Zarontin dosage (Tr. 401).

Plaintiff visited Dr. Jacobson again on May 3, 2005 and reported occasional seizure episodes, migraine headaches and increased anxiety at school (Tr. 400). Dr. Jacobson adjusted his medication and recommended a new educational plan (Tr. 400). On November 30, 2005, plaintiff's seizure episodes and anxiety had improved, but he reported some incidents of over-focusing on tasks (Tr. 399).

Plaintiff did not visit Dr. Jacobson again until May 4, 2007 (Tr. 397). Plaintiff's mother reported one brief seizure episode, but that plaintiff had otherwise remained seizure-free (Tr. 397). Plaintiff reported doing extremely well academically, and his physical and neurological examinations were normal (Tr. 397).

Plaintiff visited Dr. Jacobson again on January 8, 2008 and reported that he had experienced approximately two seizures since his last appointment (Tr. 396). Plaintiff's parents

observed one of these seizures and stated that they observed plaintiff staring for approximately four seconds followed by some rapid eye movements (Tr. 396). Plaintiff reported that he was experiencing some hiccups as a side effect of his Zarontin (Tr. 396). Plaintiff further reported that he was doing very well academically (Tr. 396). Dr. Jacobson slightly increased his zarontin dosage (Tr. 396).

Plaintiff visited Dr. Jacobson again on August 12, 2008 and his parents reported that he was seizure-free since his last visit, but that his Asperger's symptoms had significantly in-creased (Tr. 394). Plaintiff exhibited over-logical thinking and a lack of independence (Tr. 394).

Plaintiff visited Dr. Jacobson again on April 29, 2009 and reported that he was experiencing a few minor breakthrough seizures since his last visit (Tr. 393). Dr. Jacobson increased his Zarontin dosage (Tr. 393). Plaintiff reported that he remained seizure-free for a year at his next appointment on April 6, 2010 (Tr. 392).

### 2. Medical Records During the Relevant Time Period

#### a. St. Luke's Cornwall Hospital

Plaintiff had a seizure on July 4, 2011 after he completed a foot race and was taken by ambulance to St. Luke's

Cornwall Hospital ("St. Luke's") for treatment (Tr. 376).
Plaintiff was disoriented when the paramedics arrived, but was
alert and oriented when he arrived at St. Luke's (Tr. 376, 379).
Plaintiff's physical and neurological examinations were normal
(Tr. 379-80). Dr. Alan Madell consulted with Dr. Jacobson who
recommended that plaintiff's Zarontin dosage be increased (Tr.
381). Plaintiff was not admitted to St. Luke's (Tr. 381).

Plaintiff was seen again by Dr. Madell in the St.
Luke's emergency department after plaintiff suffered a seizure on
September 29, 2011 which caused him to fall down and suffer some
facial abrasions (Tr. 349-50). Plaintiff reported that he had
forgotten to take his Zarontin that morning and experienced the
seizure while he was running on the treadmill that night (Tr.
351). Plaintiff was alert and able to communicate upon his
arrival at St. Luke's, and his physical and neurological examina-
tions were normal (Tr. 352-53). Dr. Madell instructed plaintiff
to continue taking Zzarontin (Tr. 250). Plaintiff was not
admitted to St. Luke's (Tr. 250).

Plaintiff went to the emergency department at St.
Luke's after he had a seizure on May 17, 2014 (Tr. 447). Plain-
tiff was lethargic, but coherent upon his arrival at the hospital
(Tr. 447). Plaintiff was discharged the same day and was in-
structed to follow-up with his neurologist and to continue with
his medication (Tr. 453).

Plaintiff visited St. Luke's emergency department on July 17, 2014 after he again suffered a seizure while walking on the treadmill (Tr. 507). Plaintiff fell on the back of his head during the seizure and reported pain upon his arrival to the hospital (Tr. 507). Plaintiff's neurological examination was normal, except for some confusion when he first arrived (Tr. 508). Plaintiff's head CT was normal and he was not admitted to St. Luke's (Tr. 508, 513).

Plaintiff visited St. Luke's emergency department again on February 12, 2015 after he had a seizure and fell inside a restaurant (Tr. 519). Plaintiff suffered a 2.5 centimeter laceration to his left eyelid and swelling in his forehead and lips (Tr. 519). Plaintiff reported pain to his head while being treated in the emergency department (Tr. 519). Plaintiff further reported that he had missed several doses of Depakote[12] (Tr. 519). Plaintiff's head CT revealed no fractures or abnormalities and he was discharged to his parents the same day (Tr. 524, 531, 533).

Plaintiff visited St. Luke's emergency department again on January 7, 2016 after he had a seizure while riding in a car with his mother (Tr. 614). Plaintiff was alert and awake upon

---

[12]Depakote, or valproic acid, is an anticonvulsant oral medication that works within the brain tissue to stop seizures. Valproic Acid, Mayo Clinic, available at https://www.mayoclinic.org/drugs-supplements/valproic-acid-oral-route/description/drg-20072931 (last visited Mar. 18, 2019).

his arrival to the hospital and was discharged the same day (Tr. 615).

Plaintiff visited St. Luke's emergency department again on April 27, 2016 after he suffered a seizure (Tr. 620). Plaintiff reported that he lost consciousness during the seizure and suffered an abrasion to his forehead when he fell (Tr. 620). Plaintiff further reported that he had skipped a few doses of his Depakote and experienced a small seizure the day before (Tr. 620). Plaintiff's head CT was normal (Tr. 623-25). Plaintiff was discharged the same day and instructed to follow-up with his neurologist (Tr. 621-22).

### b.  Dr. Ronald I. Jacobson

Plaintiff visited Dr. Jacobson for a follow-up appointment on August 2, 2011 (Tr. 391). Dr. Jacobson was aware of the major seizure that plaintiff suffered on July 4, 2011 and discussed the importance of plaintiff complying with his medication regimen (Tr. 391). Plaintiff reported that he was doing well and was enjoying college at Mount Saint Mary (Tr. 391).

Plaintiff visited Dr. Jacobson again on June 18, 2012 (Tr. 390). Dr Jacobson was aware of the seizure that plaintiff suffered on September 29, 2011, and plaintiff reported that he recently had a generalized seizure that did not require

hospitalization (Tr. 390). Plaintiff also reported increased anxiety and difficulties at school (Tr. 390). Dr. Jacobson recommended that plaintiff start Depakote in addition to Zarontin and recommended that plaintiff continue therapy for his anxiety (Tr. 390).

### c.  Dr. Leland G. DeEvoli

Plaintiff visited Dr. Leland G. DeEvoli, a psychiatrist, on January 16, 2012 (Tr. 386). Plaintiff was accompanied to the evaluation by his mother who expressed concern about plaintiff's anxiety and obsessive thinking (Tr. 386). Plaintiff reported that he was having difficulty focusing at school and was experiencing anxiety over breaking up with his girlfriend and being unable to find a new one (Tr. 386).

Dr. DeEvoli noted that plaintiff was appropriately groomed and dressed during the evaluation (Tr. 387). Plaintiff appeared somewhat anxious and was somewhat "literal" in describing himself, but no gross abnormalities or psychotic deficits were noted (Tr. 387). Plaintiff denied suicidal or homicidal thoughts, and his thought process and judgment appeared normal and goal-oriented (Tr. 387). Upon completion of his evaluation, Dr. DeEvoli noted the following diagnostic impressions: (1) Asperger's, (2) anxiety disorder, (3) childhood partial complex

seizures with one grand mal seizure[13] and (4) loneliness for girlfriend (Tr. 387). Dr. DeEvoli opined that plaintiff did not appear to be a danger to himself or others, and recommended plaintiff start a small dose of Lexapro[14] once his neurologist approved it (Tr. 387).

Plaintiff visited Dr. DeEvoli again on October 28, 2013, December 3, 2013 and May 3, 2014; however, Dr. DeEvoli's records from these visits only consist of a few handwritten sentences which are largely illegible (Tr. 389).

### d.  Dr. Orrin Devinsky

Plaintiff visited Dr. Orrin Devinsky, a neurologist and epilepsy specialist, on December 14, 2012 (Tr. 418). Dr. Devinsky reviewed plaintiff's history of seizures and noted that he was alert and oriented during the evaluation (Tr. 419). Dr. Devinsky diagnosed plaintiff with epilepsy and ordered a head MRI and a video EEG (Tr. 419).

---

[13]Grand mal seizures, or tonic-clonic seizures, are the most dramatic type of epileptic seizure and can cause an abrupt loss of consciousness, body stiffening and shaking. Epilepsy, Mayo Clinic, available at https://www.mayoclinic.org/diseases-conditions/epilepsy/symptoms-causes/syc-20359993 (last visited Mar. 18, 2019).

[14]Lexapro, or escitalopram, is an antidepressant used to treat depression and generalized anxiety by increasing the activity of serotonin in the brain. Escitalopram, Mayo Clinic, available at https://www.mayoclinic.org/drugs-supplements/escitalopram-oral-route/description/drg-20063707 (last visited Mar. 18, 2019).

Plaintiff visited Dr. Devinsky again on February 11, 2013 and reported that he was feeling fatigued, but that he had not experienced any seizures, headaches or dizziness since his last visit (Tr. 422). Plaintiff was alert and oriented during his examination (Tr. 422). Plaintiff's speech, motor behavior, attention, concentration and memory were normal, and he was able to spell and multiply numbers correctly (Tr. 422). However, Dr. Devinsky noted that plaintiff's eye contact and judgment were "reduced" (Tr. 422). Plaintiff's physical examination, neurological examination, reflexes, sensations and coordination were all normal (Tr. 422-23). Dr. Devinsky diagnosed plaintiff with Apserger's and epilepsy, and recommended that plaintiff stop taking Zarontin and start taking Depakote (Tr. 423).

Plaintiff visited Dr. Devinksy again on December 18, 2013 and reported that he had not experienced any seizures since his last appointment (Tr. 440). Plaintiff reported that he was doing well academically, but that he sometimes daydreamed during class (Tr. 440). Plaintiff was alert and oriented during his examination (Tr. 440). Plaintiff's speech, motor behavior, attention, concentration, memory, mood, eye contact and judgment were normal, and he was able to spell and multiply numbers correctly (Tr. 440). Plaintiff's physical examination, neurological examination, reflexes, sensations and coordination were all normal (Tr. 440-41). Dr. Devinsky opined that plaintiff was

16

stable (Tr. 441).

Plaintiff visited Dr. Devinsky again on August 11, 2014 and reported two seizures since his last visit that he believed were caused by sleep deprivation and missed medications (Tr. 480). Plaintiff further reported that he was experiencing anxiety (Tr. 480). Plaintiff was alert and oriented during his examination (Tr. 480). Plaintiff's speech, motor behavior, attention, concentration, memory, mood, eye contact and judgment were normal (Tr. 480-81). Plaintiff's physical examination, neurological examination, reflexes, sensations and coordination were all normal (Tr. 480-81).

Plaintiff visited Dr. Devinsky again on December 15, 2014 and reported two seizures since his last visit that he believed were caused by sleep deprivation, school-related stress and missed medications (Tr. 543). Plaintiff's EEG was normal and did not confirm or refute his previous epilepsy diagnosis (Tr. 543, 566). Plaintiff was alert and oriented during his examination (Tr. 544). Plaintiff's speech, motor behavior, attention, concentration, memory, mood, eye contact and judgment were normal (Tr. 544). Plaintiff's physical examination, neurological examination, reflexes, sensations and coordination were all normal (Tr. 544-45).

Plaintiff next visited Dr. Devinsky on August 26, 2015 and reported that he had not experienced any seizures since

February (Tr. 603). Plaintiff further reported that he had moved
back in with his parents since graduating from college and that
he was regularly running three to six miles per day (Tr. 603).
Plaintiff was still experiencing some anxiety (Tr. 603). Plain-
tiff's EEG was normal and neither confirmed nor refuted his
previous epilepsy diagnosis (Tr. 605). Plaintiff was alert and
oriented during his examination (Tr. 603). Plaintiff's speech,
motor behavior, attention, concentration, memory, mood, eye
contact and judgment were normal (Tr. 603). Plaintiff's physical
examination, neurological examination, reflexes, sensations and
coordination were all normal (Tr. 603-04). Dr. Devinsky contin-
ued to diagnose plaintiff with Asperger's and epilepsy (Tr. 604).

          Plaintiff visited Dr. Devinsky again on February 17,
2016 and reported that he had experienced one seizure in January,
but otherwise had remained seizure-free since his last appoint-
ment (Tr. 606). Plaintiff further reported that he was still
regularly running three to six miles per day and still experienc-
ing some anxiety (Tr. 606). Plaintiff's EEG was again normal and
neither confirmed nor refuted his previous epilepsy diagnosis
(Tr. 608). Plaintiff was alert and oriented during his examina-
tion (Tr. 606). Plaintiff's speech, motor behavior, attention,
concentration, memory, mood, eye contact and judgment were normal
(Tr. 606). Plaintiff's physical examination, neurological

18

examination, reflexes, sensations and coordination were all normal (Tr. 606-07). Dr. Devinsky continued to diagnose plaintiff with epilepsy (Tr. 607).

Dr. Devinsky filled out a medical source statement for plaintiff on August 17, 2016 (Tr. 651). Dr. Devinsky noted that plaintiff's last three seizures occurred on February 12, 2015, January 7, 2016 and August 4, 2016, and described plaintiff's seizures as "generalized" and usually lasting approximately five minutes (Tr. 651). Dr. Devinsky further noted that sleep deprivation and stress commonly precipitated plaintiff's seizures (Tr. 652). Dr. Devinsky stated that plaintiff generally experienced fatigue and headaches for approximately 24 hours after a seizure (Tr. 652).

With respect to plaintiff's work functional capabilities, Dr. Devinsky opined that plaintiff would not require more supervision because of his epilepsy and that he was capable of performing a low-stress job, but that plaintiff was unable to operate machinery, work at heights or operate a motor vehicle (Tr. 653-54). Dr. Devinsky further opined that plaintiff would need to take a 15-minute break every four hours during an eight-hour work day (Tr. 654). Dr. Devinsky did not render any opinion on whether or how often plaintiff would likely be absent from work as a result of his impairments (Tr. 654).

Dr. Devinsky wrote a letter on September 7, 2016 and

stated that he believed that plaintiff should "obtain disability due to his seizure disorder and medical diagnoses" (Tr. 655). Dr. Devinsky did not examine plaintiff on that date (Tr. 655).

### e.  Dr. Terri L. Copans

Plaintiff visited Dr. Terri L. Copans, a psychologist, for a neuropsychological evaluation on October 8, 2013 (Tr. 641). Dr. Copans noted that plaintiff was alert, cooperative, oriented and pleasant throughout the evaluation (Tr. 642-43).  Plaintiff exhibited a stable mood and a logical and coherent thought process (Tr. 642-43).  Dr. Copans conducted multiple intelligence, attention, language and memory tests on plaintiff on which plaintiff scored in either the above average or average range, except for his working memory, logical memory and verbal fluency in which he scored within the low average range (Tr. 643). Plaintiff's mother completed plaintiff's adaptive and emotional behavior assessment and based on her answers, Dr. Copans found that plaintiff's adaptive functioning, such as his ability to perform the basic maintenance activities of daily living, fell significantly below expectation when compared to his intellectual abilities (Tr. 644).  Dr. Copans further found that plaintiff's and plaintiff's mother's descriptions of his behavior placed him within the "at risk" range with respect to his ability to adapt readily to changes in his environment, his regard towards his

parents and his feelings of self-esteem, self-respect and self-acceptance (Tr. 644-45).

Dr. Copas opined that plaintiff's test results were consistent with "high functioning autism" and that while plaintiff did not have any intellectual or language impairments, he needed further assistance with social communication and repetitive behaviors (Tr. 645). She further opined that plaintiff should avoid jobs with a high potential for social conflict, but that he did not possess significant cognitive limitations that would impede his ability to find work (Tr. 646). Dr. Copas diagnosed plaintiff with autism spectrum disorder, epilepsy and mild executive dysfunction, and recommended that he work with an organization that specializes in services for individuals with autism to assist him in transitioning as an independent young adult into the community (Tr. 645-46).

### f.   Dr. Howard L. Barenfeld

Plaintiff was treated by Dr. Howard L. Barenfeld, his primary care physician, from 1997 through 2014. Dr. Barenfeld's records consist of approximately 29 pages of short, handwritten notes from his treatment of plaintiff for ailments unrelated to plaintiff's social security claim (Tr. 573-601).

However, Dr. Barenfeld filled out a functional capacity report with respect to plaintiff's claim on July 28, 2014 (Tr.

460-74). In that report, Dr. Barenfeld stated that plaintiff was suffering from Apserger's, a seizure disorder and asthma all of which were controlled with medication (Tr. 460). Dr. Barenfeld opined that plaintiff did not have any physical, neurological or mental abnormalities (Tr. 460-74). Dr. Barenfeld further opined that plaintiff's attitude, appearance, behavior, speech, thought, perception, mood, attention, concentration, orientation, memory and thought process were all normal (Tr. 468). Dr. Barenfeld concluded that plaintiff did not have any work-related physical or mental limitations (Tr. 470-74).

## g. Dr. Leslie Helprin

Plaintiff visited Dr. Leslie Helprin for a psychiatric consultative examination on September 23, 2014 (Tr. 486). Plaintiff reported difficulty sleeping, loneliness and anxiety about finding a girlfriend and finding a job after college (Tr. 487). Plaintiff's parents reported that plaintiff was able to dress, bathe and groom himself, and that he was able to cook and prepare his own meals, clean, do laundry, shop and manage his own money (Tr. 488). Plaintiff was unable to drive, but occasionally took public transportation (Tr. 488). Plaintiff reported that his hobbies included politics, watching television, listening to music, running, bowling, tennis, going out to eat, going to the movies, flying remote-controlled airplanes and collecting stamps

22

and coins (Tr. 488). Plaintiff further reported that he social-
ized with friends and had "pretty good" family relationships (Tr.
488).

Dr. Helprin noted that plaintiff was well dressed and
appropriately groomed at his evaluation (Tr. 487). Plaintiff was
cooperative, alert, exhibited normal behavior and maintained
appropriate eye contact (Tr. 487). Plaintiff's thought process
was coherent and goal-oriented, and his attention and concentra-
tion were intact (Tr. 488). Dr. Helprin noted that plaintiff's
mood was neutral to somewhat anxious and that his memory was
mildly impaired due to his anxiety (Tr. 488). Dr. Helprin
described plaintiff's cognitive functioning as "average" (Tr.
488).

Dr. Helprin diagnosed plaintiff with adjustment disor-
der[15] with mild anxiety (Tr. 489). She opined that plaintiff had
no limitations with following and understanding simple direc-
tions, performing simple and complex tasks independently, main-
taining attention and concentration, maintaining a regular
schedule, making appropriate decisions, relating adequately with
others or dealing with stress (Tr. 489). Dr. Helprin further

---

[15]Adjustment disorders are stress-related conditions in
which patients experience more stress than would normally be
expected in response to a stressful and unexpected event. See
Adjustment Disorders, Mayo Clinic, available at
https://www.mayoclinic.org/diseases-conditions/symptoms-
causes/syc-20355224 (last visited Mar. 18, 2019).

23

opined that plaintiff's examination appeared consistent with some secondary psychiatric difficulties, but that these findings were not significant enough to interfere with plaintiff's ability to function on a daily basis (Tr. 489). Dr. Helprin recommended that plaintiff continue with his education and seek counseling services through his college if needed (Tr. 489).

## h. Dr. Rita Figueroa

Plaintiff visited Dr. Rita Figueroa, a general surgeon, for a neurological consultative examination on September 26, 2014 (Tr. 492). Plaintiff reported that he had been experiencing petite seizures throughout his life and grand mal seizures since 2011 (Tr. 492). Plaintiff reported that his last grand mal seizure was in July 2014 (Tr. 492).

Dr. Figueroa noted that plaintiff was dressed appropriately, maintained appropriate eye contact and appeared oriented to time, person and place during his examination (Tr. 493). Plaintiff's memory, mood, affect and judgment were normal with no abnormalities (Tr. 493). Plaintiff's physical and neurological examinations were normal (Tr. 493-94). Dr. Figueroa diagnosed plaintiff with seizures and opined that his prognosis was fair (Tr. 494). Dr. Figueroa recommended that plaintiff refrain from driving and operating machinery, but opined that he had no other physical limitations (Tr. 494).

24

## i.  Vitality Physicians Group Practice

Plaintiff visited Deborah Birnbaum, a licensed social worker ("SW"), at Vitality Physicians Group Practice on July 21, 2015 (Tr. 568).  Plaintiff reported increased anxiety because he had graduated in May and still had not found a job (Tr. 568). Plaintiff further reported insomnia, feelings of boredom and hopelessness and panic symptoms, such as rapid breathing and nausea (Tr. 568).

SW Birnbaum noted that plaintiff was alert, oriented and properly groomed and dressed during his evaluation (Tr. 568). She further noted that his memory, speech and behavior was normal (Tr. 568).  SW Birnbaum observed that plaintiff appeared anxious and his thought content was "preoccupied" (Tr. 568).  SW Birbaum diagnosed plaintiff with anxiety (Tr. 568).

Plaintiff returned to Vitality Physicians Group Practice a week later on July 28, 2015 and was examined by Dr. Mitchell Cabisudo (Tr. 570).  Plaintiff reported that his condition remained unchanged (Tr. 570).  Dr. Cabisudo noted that plaintiff was cooperative, oriented and alert during his evaluation (Tr. 571).  He further noted that plaintiff's judgment and insight were "fair" and that plaintiff appeared anxious, but exhibited a logical thought process (Tr. 571).  Dr. Cabisudo diagnosed plaintiff with anxiety and pervasive developmental

disorder, and opined that plaintiff had "moderate" symptoms (Tr. 572). Dr. Cabisudo recommended an increase in plaintiff's Lexapro medication and therapy to address his anxiety (Tr. 571).

Plaintiff visited Dr. Cabisudo again on August 11, 2015 and reported that he was feeling much better during the day, but was still experiencing anxiety and "racing thoughts" at night (Tr. 636). Dr. Cabisudo noted that plaintiff was cooperative, oriented and alert during his evaluation (Tr. 636). He further noted that plaintiff's mood had improved since his last visit and that plaintiff exhibited a logical thought process (Tr. 636). Dr. Cabisudo diagnosed plaintiff with anxiety, pervasive developmental disorder and epilepsy, and continued to recommend medication and therapy (Tr. 636-37).

Plaintiff next visited Dr. Cabisudo on September 1, 2015 and reported feeling and sleeping much better (Tr. 634). Dr. Cabisudo noted that plaintiff was cooperative, oriented and alert during his evaluation (Tr. 634). He further noted that plaintiff's mood had improved since his last visit and that plaintiff exhibited a logical thought process (Tr. 634). Dr. Cabisudo continued to diagnose plaintiff with anxiety, pervasive developmental disorder and epilepsy, and to recommend medication and therapy (Tr. 634-35).

Plaintiff visited Dr. Cabisudo again on October 20, 2015 and reported feeling angry about not being independent (Tr.

26

632).  Plaintiff further reported that he was losing friends due
to his inflexibility and poor social skills (Tr. 632).  Dr.
Cabisudo noted that plaintiff was cooperative, oriented and alert
during his evaluation (Tr. 632).  He further noted that plain-
tiff's mood continued to be "improved" and that plaintiff exhib-
ited a logical thought process (Tr. 632).  Dr. Cabisudo continued
to diagnose plaintiff with anxiety, pervasive developmental
disorder and epilepsy, and to recommend medication and therapy
(Tr. 632-33).

        Plaintiff visited Dr. Cabisudo again on June 11, 2016
and reported anxiety and insomnia (Tr. 630).  Plaintiff further
reported that he had started a part-time job as a food server and
that he had broken up with his girlfriend, but that his friends
were helping him cope with being single (Tr. 630).  Dr. Cabisudo
noted that plaintiff was cooperative, oriented and alert during
his evaluation (Tr. 630).  He further noted that plaintiff's mood
had improved since his last visit and that plaintiff exhibited a
logical thought process (Tr. 630).  Dr. Cabisudo continued to
diagnose plaintiff with anxiety, pervasive developmental disorder
and epilepsy, and to recommend medication and therapy (Tr. 630-
31).

### j.   Melanie Zeman

On September 21, 2015, Melanie Zeman, a licensed social worker, filled out a medical source form on behalf of plaintiff (Tr. 602). SW Zeman stated that she had been working with plaintiff since April 29, 2015 and opined that plaintiff was having difficulty transitioning from college to independent living due to his Asperger's, anxiety and OCD (Tr. 602). SW Zeman further opined that plaintiff needed "continued intensive support" to help him transition into an independent adult (Tr. 602).

### D.   Proceedings Before the ALJ

#### 1.   Plaintiff's Testimony

Plaintiff testified that he was experiencing seizures approximately once every two to three months (Tr. 56). Plaintiff described these seizures as grand mal seizures and explained that they caused him to lose consciousness and convulse on the floor for approximately two and a half to five minutes (Tr. 56-57)

Plaintiff testified that he was "looking actively" for a job, but eventually admitted that he had not actually applied anywhere because he found it too "anxiety provoking" to reach out to or interact with authority figures (Tr. 82-83). Plaintiff testified that he obtained his current food server position

through a job coach (Tr. 81). Plaintiff testified that he enjoys his position because it is very structured and claimed that he does not believe he could perform in a job that did not have structure (Tr. 86-87).

## 2. Vocational Expert's Testimony

Vocational expert Suji Komoraf (the "VE") also testified at the hearing. The ALJ asked the VE to consider a hypothetical individual of plaintiff's age, education and work history, who could perform work at all exertional levels with the following limitations:

> The person can understand, remember and carry out simple work and can adapt to routine workplace changes. In addition, the person can occasionally interact with supervisors, coworkers and the general public. The person cannot work at unprotected heights, cannot work at -- on ladders, ropes or scaffolds, cannot work on machinery with moving mechanical parts such as conveyor belts. The person must avoid extreme temperatures. The person cannot drive motor vehicles. The person must also avoid concentrated exposure to dust, fumes and noxious gases.

(Tr. 89-90). The AlJ asked the VE if such a hypothetical individual could perform any occupations in the regional or national economy (Tr. 90). The VE testified that such an individual could perform work as defined in the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT") as a mail clerk, DOT Code Number 209.687-026, of which there are 102,000 positions nationally, an office helper, DOT Code No. 239.567-010, of which there

are 76,000 positions nationally, a housekeeping cleaner, DOT Code No. 323.687-014, of which there are 247,000 jobs nationally and a marker, DOT Code No. 209.587-034, of which there are 50,000 positions nationally (Tr. 90). The VE also testified that a such a hypothetical individual would not be able to sustain employment if he had to be off task 20% of the workday (Tr. 90-91).

III. Analysis

A. Applicable
Legal Principles

1. Standard of Review

The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard. 42 U.S.C. § 405(g); Lockwood v. Comm'r of Soc. Sec. Admin., --- F.3d --- , 2019 WL 366695 at *3 (2d Cir. Jan. 23, 2019); Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2014) (per curiam); Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008). Moreover, the court cannot "affirm an administrative action on grounds different from those consid- ered by the agency." Lesterhuis v. Colvin, 805 F.3d 83, 86 (2d Cir. 2015), quoting Burgess v. Astrue, supra, 537 F.3d at 128.

The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence. Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003), citing Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." Ellington v. Astrue, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (Marrero, D.J.). However, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

"'Substantial evidence' is 'more than a mere scintilla. It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Talavera v. Astrue, supra, 697 F.3d at 151, quoting Richardson v. Perales, 402 U.S. 389, 401 (1971). Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam), quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982). Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is

31

required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Selian v. Astrue, supra, 708 F.3d at 417 (citation omitted).

## 2. Determination
## Of Disability

Under Title II and Title XVI of the Act, a claimant is entitled to DIB or SSI if he can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both impairment and inability to work must last twelve months). The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), and it must be

> of such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [the claimant] lives, or whether a specific job vacancy exists for [the claimant], or whether [the claimant] would be hired if [the claimant] applied for work.

42 U.S.C. § 423(d)(2)(A). In addition, to obtain DIB, the claimant must have become disabled between the alleged onset date and the date on which he was last insured. See 42 U.S.C. §§

32

416(i), 423(a); 20 C.F.R. §§ 404.130, 404.315; McKinstry v.
Astrue, 511 F. App'x 110, 111 (2d Cir. 2013) (summary order),
citing Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008). In
making the disability determination, the Commissioner must
consider:  "'(1) the objective medical facts; (2) diagnoses or
medical opinions based on such facts; (3) subjective evidence of
pain or disability testified to by the claimant or others; and
(4) the claimant's educational background, age, and work experi-
ence.'" Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per
curiam), quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir.
1983) (per curiam).

        In determining whether an individual is disabled, the
Commissioner must follow the five-step process required by the
regulations.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v),
416.920(a)(4)(i)-(v); see Selian v. Astrue, supra, 708 F.3d at
417-18; Talavera v. Astrue, supra, 697 F.3d at 151. The first
step is a determination of whether the claimant is engaged in
substantial gainful activity ("SGA"). 20 C.F.R. §§
404.1520(a)(4)(i), 416.920(a)(4)(i). If he is not, the second
step requires determining whether the claimant has a "severe
medically determinable physical or mental impairment." 20 C.F.R.
§§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant does
not have a severe medically determinable impairment or combina-
tion of impairments, he is not disabled. See Henningsen v.

Comm'r of Soc. Sec. Admin., 111 F. Supp. 3d 250, 264 (E.D.N.Y. 2015); 20 C.F.R. §§ 404.1520(c), 416.920(c). If he does, the inquiry at the third step is whether any of claimant's impairments meet one of the listings in Appendix 1 of the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the answer to this inquiry is affirmative, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant does not meet any of the listings in Appendix 1, step four requires an assessment of the claimant's residual functional capacity ("RFC") and whether the claimant can still perform his past relevant work given his RFC. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at 24-25. If he cannot, then the fifth step requires assessment of whether, given the claimant's RFC, he can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(iv). If he cannot, he will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

RFC is defined in the applicable regulations as "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). To determine RFC, the ALJ "'identif[ies] the individual's functional limitations or restrictions and assess[es] . . . [his] work-related abilities on a function-by-function basis, including the functions in para-

graphs (b),(c), and (d) of 20 [C.F.R. §§] 404.1545 and 416.945.'"
Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per
curiam), quoting Social Security Ruling ("SSR") 96-8p, 1996 WL
374184 at *1 (July 2, 1996). The results of this assessment
determine the claimant's ability to perform the exertional
demands of sustained work which may be categorized as sedentary,
light, medium, heavy or very heavy.[16]  20 C.F.R. §§ 404.1567,
416.967; see Schaal v. Apfel, 134 F.3d 496, 501 n.6 (2d Cir.
1998). This ability may then be found to be limited further by
nonexertional factors that restrict the claimant's ability to
work.[17]  See Michaels v. Colvin, 621 F. App'x 35, 38 n.4 (2d Cir.
2015) (summary order); Zabala v. Astrue, 595 F.3d 402, 410-11 (2d
Cir. 2010).

        The claimant bears the initial burden of proving
disability with respect to the first four steps. Once the
claimant has satisfied this burden, the burden shifts to the

---

[16]Exertional limitations are those which "affect only [the
claimant's] ability to meet the strength demands of jobs (sit-
ting, standing, walking, lifting, carrying, pushing, and pull-
ing)." 20 C.F.R. §§ 404.1569a(b), 416.969a(b).

[17]Nonexertional limitations are those which "affect only
[the claimant's] ability to meet the demands of jobs other than
the strength demands," including difficulty functioning because
of nervousness, anxiety or depression, maintaining attention or
concentration, understanding or remembering detailed instruc-
tions, seeing or hearing, tolerating dust or fumes, or manipula-
tive or postural functions, such as reaching, handling, stooping,
climbing, crawling or crouching. 20 C.F.R. §§ 404.1569a(c),
416.969a(c).

Commissioner to prove the final step -- that the claimant's RFC
allows the claimant to perform some work other than his past
work. Selian v. Astrue, supra, 708 F.3d at 418; Burgess v.
Astrue, supra, 537 F.3d at 128; Butts v. Barnhart, 388 F.3d 377,
383 (2d Cir. 2004), amended in part on other grounds on reh'g,
416 F.3d 101 (2d Cir. 2005).

          In some cases, the Commissioner can rely exclusively on
the Medical-Vocational Guidelines (the "Grids") contained in
C.F.R. Part 404, Subpart P, Appendix 2 when making the determina-
tion at the fifth step. Gray v. Chater, 903 F. Supp. 293, 297-98
(N.D.N.Y. 1995). "The Grid[s] take[] into account the claimant's
RFC in conjunction with the claimant's age, education and work
experience. Based on these factors, the Grid[s] indicate[]
whether the claimant can engage in any other substantial gainful
work which exists in the national economy." Gray v. Chater,
supra, 903 F. Supp. at 298; see Butts v. Barnhart, supra, 388
F.3d at 383.

          Exclusive reliance on the Grids is not appropriate
where nonexertional limitations "significantly diminish [a
claimant's] ability to work." Bapp v. Bowen, 802 F.2d 601, 603
(2d Cir. 1986); accord Butts v. Barnhart, supra, 388 F.3d at 383.
"Significantly diminish" means "the additional loss of work
capacity beyond a negligible one or, in other words, one that so
narrows a claimant's possible range of work as to deprive him of

36

a meaningful employment opportunity." Bapp v. Bowen, supra, 802
F.2d at 606 (footnote omitted); accord Selian v. Astrue, supra,
708 F.3d at 421; Zabala v. Astrue, supra, 595 F.3d at 411.
Before an ALJ determines that sole reliance on the Grids is
proper in determining whether a plaintiff is disabled under the
Act, he must ask and answer the intermediate question -- whether
the claimant has nonexertional limitations that significantly
diminish his ability to work; an ALJ's failure to explain how he
reached his conclusion to this question is "plain error". See
Maldonado v. Colvin, 15 Civ. 4016 (HBP), 2017 WL 775829 at *21-
*23 (S.D.N.Y. Feb. 23, 2017) (Pitman, M.J.); see also Bapp v.
Bowen, supra, 802 F.2d at 606 ; St. Louis ex rel. D.H. v. Comm'r
of Soc. Sec., 28 F. Supp. 3d 142, 148 (N.D.N.Y. 2014); Baron v.
Astrue, 11 Civ. 4262 (JGK)(MHD), 2013 WL 1245455 at *19 (S.D.N.Y.
Mar. 4, 2013) (Dolinger, M.J.) (Report & Recommendation),
adopted at, 2013 WL 1364138 (S.D.N.Y. Mar. 26, 2013) (Koeltl,
D.J.). When the ALJ finds that the nonexertional limitations do
significantly diminish a claimant's ability to work, then the
Commissioner must introduce the testimony of a vocational expert
or other similar evidence in order to prove "that jobs exist in
the economy which [the] claimant can obtain and perform." Butts
v. Barnhart, supra, 388 F.3d at 383-84 (internal quotation marks
omitted); see Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983)
("If an individual's capabilities are not described accurately by

a rule, the regulations make clear that the individual's particu-
lar limitations must be considered.").

B.   The ALJ's Decision

The ALJ applied the five-step analysis described above
and determined that plaintiff was not disabled (Tr. 18-30).

As an initial matter, the ALJ found that plaintiff met
the insured status requirements of the Act through September 30,
2014 (Tr. 20).

At step one of the sequential analysis, the ALJ deter-
mined that plaintiff had not engaged in any substantial gainful
activity since January 1, 2011 (Tr. 20).[18]

At step two, the ALJ found that plaintiff had the
following severe medically determinable impairments:  pervasive
development disorder, autism spectrum disorder, OCD, executive
function disorder, anxiety and epileptic seizures (Tr. 21).

At step three, the ALJ found that plaintiff's impair-
ments did not meet or equal the criteria of the listed impair-
ments and that plaintiff was not, therefore, entitled to a
presumption of disability (Tr. 21-23).  The ALJ gave special
consideration to Listings 11.02 (convulsive epilepsy) and 11.03

---

[18]The ALJ acknowledged plaintiff's part-time work performed
after the alleged onset disability date, but found that "this
work activity did not rise to the level of substantial gainful
activity" (Tr. 20).

(non-convulsive epilepsy) and determined that plaintiff did not meet these listings because he was not experiencing convulsive seizures more than once a month and he was not experiencing non-convulsive seizures more than once a week (Tr. 21). The ALJ further noted that there was evidence of plaintiff's non-compliance with his seizure medication (Tr. 21).

The ALJ also found that plaintiff's mental impairments did not meet or medically equal Listings 12.04 (depressive and bi-polar disorders), 12.06 (anxiety and obsessive-compulsive disorders) and 12.10 (autism spectrum disorder) because the record did not show that plaintiff's mental impairments met the requirements of paragraph B of these Listings; namely, that plaintiff's impairments did not result in "at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration" (Tr. 21-22). The ALJ further concluded that plaintiff did also not meet the requirements of paragraph C of these Listings because "the medical evidence of record [did] not indicate that [plaintiff's] mental impairments have resulted in repeated episodes of decompensation, a residual disease process resulting in marginal adjustment, or a history of inability to function outside of a highly supportive living arrangement" (Tr. 22).

The ALJ then determined that plaintiff had the RFC to perform a full range of work at all exertional levels, except that he was limited to the nonexertional limitations of

> [Plaintiff] can understand, remember, and carry out simple work, and he can adapt to routine workplace changes. He can occasionally interact with supervisors, coworkers, and the public. He must never drive motor vehicles, work around unprotected heights or machinery with moving mechanical parts such as conveyor belts, or work on ladders, ropes, and scaffolds. Finally, he must avoid temperature extremes and concentrated exposure to dust fumes and noxious gases.

(Tr. 22-23).

As part of his analysis of the severity of plaintiff's conditions and in order to reach the RFC determination, the ALJ examined the opinions of the treating and consultative sources and assessed the weight to be given to each opinion based on the objective medical record (Tr. 24-27).

The ALJ afforded "significant weight" to Dr. Figueroa's opinion that plaintiff had no physical limitations, but that he should avoid driving or operating machinery because it was "consistent with the findings of her thorough examination" and with the overall record (Tr. 24-25).

The ALJ afforded "significant weight" to Dr. Barenfeld's opinion that plaintiff had no physical limitations because plaintiff "was living and working independently at college" and the opinion was consistent with the opinion of Dr. Figueroa (Tr. 25). However, the ALJ assigned "little weight" to

Dr. Barenfeld's opinion that plaintiff "had no limitations with concentration, understanding, social interaction, and adaptation" because Dr. Barenfeld was not a mental health expert and his opinion was inconsistent with the evidence of record that demonstrated that plaintiff had moderate difficulties in those areas (Tr. 25).

The ALJ afforded "some weight" to Dr. Devinsky's opinion that plaintiff did not need more supervision than an unimpaired worker due to his seizure disorder, but that he could not work at heights, with power machines, with chemical hazards or in extreme temperatures (Tr. 25). The ALJ noted that Dr. Devinsky "treated [plaintiff] for a number of years and ha[d] a longitudinal understanding of his impairment, treatment, and symptoms" (Tr. 25). The ALJ further found that this opinion was "consistent with the evidence of record pertaining to [plain-tiff's] seizures" (Tr. 25). However, the ALJ assigned "little weight" to Dr. Devinksy's opinion that plaintiff "should obtain disability due to his seizure disorder and medical diagnoses" because (1) the record did not support a change in plaintiff's condition during the few weeks between Dr. Devinsky's first opinion that he could perform low stress work and his second opinion that plaintiff was disabled, (2) the opinion was vague, conclusory and lacked a function-by-function analysis and (3) whether plaintiff is "disabled" is a determination reserved to

the Commissioner (Tr. 25).

The ALJ afforded "some weight" to the opinion of Dr. Helprin that plaintiff's psychiatric difficulties were not significant enough to interfere with his ability to function on a daily basis because the opinion was consistent with her examination and with the functioning exhibited by plaintiff, "including living independently at college, attending classes five days a week, performing activities of daily living, socializing with friends, and maintaining part time employment" (Tr. 25-26).

The ALJ afforded "some weight" to Dr. Copans' opinion that plaintiff should avoid holding jobs "with a high potential for social conflict" and that he would be best at jobs that were "fairly routine" (Tr. 26). The ALJ found this opinion to be consistent with Dr. Copans' thorough examination, with the opinion of Dr. Helprin and with plaintiff's activities of daily living (Tr. 26).

The ALJ afforded "little weight" to SW Zeman's opinion that plaintiff "was severely limited in his ability to follow through with set goals and he needed continued intensive support to help him move forward" because SW Zeman was not an acceptable medical source (Tr. 26). The ALJ further found the opinion to be "vague, conclusory, and lack[ing] [a] function-by-function analysis" and that it was inconsistent with the opinions of Drs.

Helprin and Copans (Tr. 26-27).

The ALJ also considered plaintiff's testimony in his RFC determination and found that while plaintiff's medically determinable impairments could have caused his alleged symptoms, a review of the entire case record showed that plaintiff's statements regarding their intensity, persistence and limiting effects were not entirely credible (Tr. 27). First, the ALJ found that plaintiff's daily activities were not as limited as plaintiff claimed, considering he graduated college with a 3.14 grade point average, lived independently for four years of college, ran track and field, was president of the political awareness club and was a founder of the poetry club (Tr. 27). Second, the ALJ noted that plaintiff's treatment consisted entirely of medication which appeared to control his impairments (Tr. 27). Third, plaintiff successfully found employment after he graduated, and the ALJ and the VE disagreed with plaintiff's arguments that this position was a "sheltered workshop" (Tr. 27-28).

At step four, the ALJ found that plaintiff had no past relevant work because his part-time work history did not reach "substantial gainful activity levels" (Tr. 28-29).

At step five, the ALJ found that, based on the Grids and the VE's testimony, jobs existed in significant numbers in the national economy that plaintiff could perform, given his age,

43

education, work experience and RFC (Tr. 29-30).

    C.   Analysis of the
         ALJ's Decision

         Plaintiff contends that the ALJ's disability
determination was erroneous because: (1) the ALJ violated in
treating physician rule; (2) the ALJ failed to properly assess
plaintiff's credibility and (3) the ALJ's RFC assessment was
"flawed" (Plaintiff's Notice of Motion for Judgment on the
Administrative Record and Pleadings and Memorandum of Law in
Support, dated July 16, 2018 (D.I. 14) ("Pl. Memo.")).  The
Commissioner contends that the ALJ's decision was supported by
substantial evidence and should be affirmed (Memorandum of Law in
Support of Defendant's Cross-Motion for Judgment on the Plead-
ings, dated Sept. 13, 2018 (D.I. 17) ("Def. Memo.")).

         As described above, the ALJ went through the sequential
process required by the regulations.  The ALJ's analysis at steps
one and two were decided in plaintiff's favor, and the Commis-
sioner has not challenged those findings.  Step three was decided
in the Commissioner's favor, and plaintiff has not challenged
those findings.  I shall, therefore, limit my discussion to
addressing whether the ALJ's analysis at step four and five
complied with the applicable legal standards and was supported by
substantial evidence.

1.    The Treating Physician Rule

Plaintiff contends that remand is required because the ALJ gave less than controlling weight to the opinions of Dr. Devinsky (Pl. Memo. at 14-17).

In considering the evidence in the record, the ALJ must afford deference to the opinions of a claimant's treating physicians.  A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2);[19] see also Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Diaz v. Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

"[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Schisler v. Sullivan, supra, 3 F.3d at 568; Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *4 n.3 (S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).  The Second Circuit has noted that it "'do[es] not hesitate to remand when

_____

[19]The SSA recently adopted regulations that alter the standards applicable to the review of medical opinion evidence with respect to claims filed on or after March 27, 2017.  See 20 C.F.R. §§ 404.1520c, 416.920c.  Because plaintiff's claim was filed before that date, those regulations do not apply here.

45

the Commissioner has not provided "good reasons" for the weight given to a treating physician[']s opinion.'" Morgan v. Colvin, 592 F. App'x 49, 50 (2d Cir. 2015) (summary order), quoting Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004); accord Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015).

As long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted. See Halloran v. Barnhart, supra, 362 F.3d at 32-33; see also Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013); Petrie v. Astrue, 412 F. App'x 401, 406-07 (2d Cir. 2011) (summary order); Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009) (summary order). "The opinions of examining physicians are not controlling if they are contradicted by substantial evidence, be that conflicting medical evidence or other evidence in the record." Krull v. Colvin, 669 F. App'x 31, 32 (2d Cir. 2016) (summary order) (citation omitted); see also Monroe v. Comm'r of Soc. Sec., 676 F. App'x 5, 7 (2d Cir. 2017) (summary order). The ALJ is responsible for determining whether a claimant is "disabled" under the Act and need not credit a treating physician's determination on this issue if it is contradicted by the medical record. See Wells v. Comm'r of Soc. Sec., 338 F. App'x 64, 66 (2d Cir. 2009) (summary order).

The ALJ may rely on the opinion of a consultative

physician where it is supported by substantial evidence in the record. See Richardson v. Perales, supra, 402 U.S. at 410; Camille v. Colvin, 652 F. App'x 25, 27-28 (2d Cir. 2016) (summary order); Diaz v. Shalala, supra, 59 F.3d at 313 n.5; Mongeur v. Heckler, supra, 722 F.2d at 1039; see also Shrack v. Berryhill, 3:16 CV 2064 (RMS), 2018 WL 2926564 at *10 (D. Conn. June 7, 2018) ("The Second Circuit has recognized . . . the opinions of non-examining sources may 'override treating sources' opinions, provided they are supported by evidence in the record." quoting Schisler v. Sullivan, supra, 3 F.3d 563 at 1993). .

Plaintiff claims, and the Commissioner and the ALJ concede, that Dr. Devinksy was one of plaintiff's treating physicians. Plaintiff contends that the ALJ violated the treating physician rule when he afforded "some weight" to Dr. Devinsky's August 2016 opinion that plaintiff did not need more supervision than an unimpaired worker due to his seizure disorder, but that he could not work at heights, with power machines, with chemical hazards or in extreme temperatures, and when he afforded "little weight" to Dr. Devinsky's September 2016 opinion that plaintiff should "obtain disability" (Pl. Memo. at 14-17).

Plaintiff's first objection is somewhat puzzling. Although plaintiff is correct that the ALJ used the term "some weight" and not "significant weight" when he was assessed Dr. Devinsky's August 2016 opinion, the ALJ's RFC finding was taken

almost verbatim from Dr. Devinsky's opinion (Tr. 25). The ALJ
found that plaintiff had the RFC to perform a full range of work
at all exertional levels, except that he was limited to the
nonexertional limitations of "never driv[ing] motor vehicles,
work[ing] around protective heights or machinery with moving
mechanical parts" and "avoid[ing] temperature extremes and
concentrated exposure to dust fumes and noxious gases" (Tr. 22-
23). This RFC is entirely consistent with Dr. Devinsky's opinion
that plaintiff "could not work at heights, with power machines or
chemical hazards or in extreme temperatures" (Tr. 25).

Thus, the ALJ did not violate the treating physician
rule by affording "some weight" to this opinion. See Walzer v.
Chater, 93 Civ. 6240 (LAK), 1995 WL 791963 at *9 (S.D.N.Y. Sept.
26, 1995) (Kaplan, D.J.) (holding that even if the ALJ violated
some portion of the treating physician rule, any such error is
considered harmless if it would not have changed the ultimate RFC
finding).

Turning to Dr. Devinsky's second opinion that plaintiff
should "obtain disability", the ALJ provided good reasons for
affording "little weight" to this opinion.

First, the ALJ found this opinion to be inconsistent
with Dr. Devinsky's prior medical source statement given just a
few weeks earlier (Tr. 25). On August 17, 2016, Dr. Devinsky
opined that plaintiff would not require more supervision at work

48

because of his epilepsy and that he was capable of performing a low-stress job, but that plaintiff was unable to operate machinery, work at heights or operate a motor vehicle (Tr. 653-54). Less than a month later, Dr. Devinsky wrote a letter in which he stated that plaintiff should "obtain disability due to his seizure disorder and medical diagnoses" (Tr. 655). The ALJ is correct is that these two opinions are inconsistent.

The ALJ is also correct that the record did not support a change in plaintiff's condition during the three weeks between Dr. Devinsky's first opinion that plaintiff could perform low stress work and his second opinion that plaintiff was disabled (Tr. 25). Plaintiff contends that by listing this reason, the ALJ "impermissibly substitute[d] his opinion for competent medical opinion" (Pl. Memo. at 16). The ALJ did no such thing. A plain reading of the record shows that plaintiff did not experience any additional seizures between August 17 and September 7, 2016, nor did he even go visit or get examined by any other medical provider. Thus, there is no logical explanation for the inconsistency between Dr. Devinsky's two opinions.

Second, the ALJ correctly found this opinion to be "vague, conclusory, and lack[ing] [a] function-by-function analysis" (Tr. 25). It is clear from the September 7, 2016 letter that Dr. Devinsky did not examine plaintiff on that date and did not provide a function-by-function analysis, or any

49

explanation for that matter, as to why he believed plaintiff should "obtain disability" (Tr. 655).

Third, it is well settled that "[a] treating physician's statement that the claimant is disabled cannot itself be determinative" with respect to a claim of disability claim under the Act. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); see also Harris v. Astrue, 935 F. Supp. 2d 603, 609 (W.D.N.Y. 2013), aff'd, 561 F. App'x 81 (2d Cir. 2014) (treating physician's "opinion that plaintiff appeared permanently disabled and unable to do any work is a conclusion of law specifically reserved to the judgment of the Commissioner").

Thus, the ALJ provided good reasons for not giving controlling weight to Dr. Devinsky's opinion that plaintiff should "obtain disability" and did not violate the treating physician rule.

## 2. Plaintiff's Credibility

Plaintiff next contends that the ALJ erred in assessing plaintiff's credibility by not giving proper weight to plaintiff's subjective complaints and his claims of their effect on his ability to work (Pl. Memo. at 17-20).

In Genier v. Astrue, supra, 606 F.3d at 49, the Second Circuit set out the framework an ALJ must follow in assessing the credibility of a plaintiff's subjective complaints in making an

RFC finding:

> When determining a claimant's RFC, the ALJ is required
> to take the claimant's reports of pain and other limi-
> tations into account, 20 C.F.R. § 416.920; see
> McLaughlin v. Sec'y of Health, Educ. & Welfare, 612
> F.2d 701, 704-05 (2d Cir. 1980), but is not required to
> accept the claimant's subjective complaints without
> question; he may exercise discretion in weighing the
> credibility of claimant's testimony in light of the
> other evidence in the record. Marcus v. Califano, 615
> F.2d 23, 27 (2d Cir. 1978).

> The regulations provide a two-step process for
> evaluating a claimant's assertions of pain and other
> limitations. At the first step, the ALJ must decide
> whether the claimant suffers from a medically determi-
> nable impairment that could reasonably be expected to
> produce the symptoms alleged. 20 C.F.R. § 404.1529(b).
> That requirement stems from the fact that subjective
> assertions of pain alone cannot ground a finding of
> disability. 20 C.F.R. § 404,1529(a). If the claimant
> does suffer from such an impairment, at the second
> step, the ALJ must consider "the extent to which [the
> claimant's] symptoms can reasonably be accepted as
> consistent with the objective medical evidence and
> other evidence" of record. Id. The ALJ must consider
> "[s]tatements [the claimant] or others make about [his]
> impairment(s), [his] restrictions, [his] daily activi-
> ties, [his] efforts to work, or any other relevant
> statements [he] make[s] to medical sources during the
> course of examination or treatment, or to [the agency]
> during interviews, on applications, in letters, and in
> testimony in [its] administrative proceedings."

20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. § 404.1529(a);

S.S.R. 96-7p, 1996 WL 374186 at *1 (July 2, 1996). An ALJ's

credibility determination is entitled to deference. See Snell v.

Apfel, 177 F.3d 128, 135 (2d Cir. 1999) ("After all, the ALJ is

in a better position to decide issues of credibility.").

Applying the two-part framework, and referring specifi-

cally to SSR 96-7p, supra, the ALJ found that "after careful

consideration of the evidence . . . [plaintiff's] medically
determinable impairments could reasonably be expected to cause
the alleged symptoms; however, [plaintiff's] statements concern-
ing the intensity, persistence and limiting effects of these
symptoms [were] not entirely consistent with the medical evidence
and other evidence in the record" (Tr. 27). Specifically, the
ALJ found that plaintiff's claim that he was too disabled to work
inconsistent with plaintiff's daily activities, his course of
treatment and his prior work history (Tr. 27-28).

Plaintiff graduated Mount Saint Mary's College with a
3.14 grade point average and was an active member of the student
body during his four years there (Tr. 40-48). Although plaintiff
explained that he was given special accommodations when he took
his examinations, the record reflects that he was able to go to
class five days a week, participate in track and field, start a
poetry club and become president of the political awareness club
(Tr. 40-48). The record also reveals that plaintiff was capable
of living independently on campus for four years (Tr. 41). Thus,
plaintiff's description of daily activities is inconsistent with
his subjective complaints.

Plaintiff's treatment throughout the entire relevant
period consisted of medication. Although there are some
instances of non-compliance throughout the record, these medica-
tions appear to have largely controlled plaintiff's epilepsy and

did not cause him to suffer any debilitating side effects that would prevent him from maintaining work.

Finally, there is substantial evidence that plaintiff worked in seasonal and part-time jobs from high school through the present (Tr. 51-56). While plaintiff testified that he had some difficulties working with authority figures and following instructions, he reported that he never lost a job because of those difficulties, and that was doing well in his position as a food server because he was given clearly defined tasks (Tr. 83, 250). The ALJ accounted for these difficulties by limiting plaintiff to simple, unskilled work and work that only required occasional contact with others (Tr. 23).

Thus, the ALJ properly considered plaintiff's credibility when making his RFC determination.

### 3. Step 4: the RFC

Plaintiff contends that the ALJ's RFC determination was "flawed" because his summary of the evidence in support of his RFC was "confusing", the ALJ should have called a medical expert and the ALJ "improperly modifie[d]" part of Dr. Devinsky's opinion (Pl. Memo. at 21-23). Plaintiff's claims are meritless.

### a.  The ALJ's Summary

First, the ALJ's summary of the medical evidence was
not "confusing."  On the contrary, the ALJ discussed the opinions
of plaintiff's treating and consultative physicians and went on
to explain in detail how he accounted for plaintiff's
nonexertional limitations:

> In summary, the medical record and [plaintiff's] alle-
> gations support the residual functional capacity de-
> fined above.  The epileptic seizures are accounted for
> by limiting [plaintiff] to never driving motor vehi-
> cles; working around unprotected heights or machinery
> with moving mechanical parts such as conveyor belts;
> working on ladders, ropes, and scaffolds; and avoiding
> temperature extremes and concentrated exposure to dust
> fumes and noxious gases.  This is supported by the
> medical records indicating periodic seizures and treat-
> ment for such seizures for much of [plaintiff's] life,
> the opinion of [plaintiff's] neurologist, Dr. Devinsky,
> and the recommendations that [plaintiff] not obtain a
> driver's license.  [Plaintiff's] mental impairments are
> accounted for by the limitations that [plaintiff] is
> capable of simple work, adapting to routine workplace
> changes, and occasionally interacting with supervisors,
> coworkers, and the public.  This is supported by Dr.
> Devinsky's opinion that [plaintiff] is capable of low
> stress work, Dr. Copans' opinion that [plaintiff] avoid
> certain jobs with a high potential for social conflict
> and that he may be best at routine jobs, and the opin-
> ion of J. Alpert that [plaintiff] is capable of full
> time employment with accommodations for his limits with
> stress tolerance and responding to others in the work-
> place.  It is supported by the evidence that indicates
> [plaintiff] has problems with multi-tasking, conflicts
> with authority, and difficulty with social interac-
> tions.  It is also supported by [plaintiff's] activi-
> ties of daily living and his ability to live independ-
> ently at college, participate in social and sports
> clubs, and engage in part time employment that involves
> simple and routine tasks.

(Tr. 28 (internal citations omitted)). The ALJ's summary is
extremely clear and concise, and shows that his RFC finding was
supported by substantial evidence. Furthermore, plaintiff does
not set forth any substantive arguments as to why the summary was
improper or confusing.

### b. No Medical Expert

Plaintiff's argument that the ALJ erred by not calling
a medical expert to assess plaintiff's RFC similarly fails.
While an ALJ has an obligation to fully develop the record, it is
well established that "where there are no obvious gaps in the
administrative record, and where the ALJ already possesses a
'complete medical history,' the ALJ is under no obligation to
seek additional information in advance of rejecting a benefits
claim." Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999),
quoting Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996).
Furthermore, the regulations do not require that the ALJ seek an
opinion of a medical expert at step four. See Velez v. Colon, 15
Civ. 0487 (SAS), 2015 WL 8491485 at *9-*10 (S.D.N.Y. Dec. 9,
2015) (Scheindlin, D.J.) (ALJ under no obligation to seek an
expert medical opinion); Van Valkenberg ex rel. B.G. v. Astrue,
08 CV 0959 (DNH/VEB), 2010 WL 2400455 at *17 (N.D.N.Y. May 27,
2010) (Report & Recommendation), adopted at, 2010 WL 2400443
(N.D.N.Y. June 10, 2010) ("[T]he regulations leave calling a

medical expert to the discretion of the ALJ.").

The ALJ had a full administrative record here with
medical records from more than ten different healthcare providers
who treated or examined plaintiff over a 20-year period prior to
the hearing.  Thus, the ALJ was under no obligation to call or
consult with a medical expert during his RFC analysis.

    c.   The ALJ Did Not "Modify"
         Dr. Devinksy's Opinion

Finally, plaintiff contends that the ALJ "impermissibly
modifie[d] Dr. Devinsky's opinion" because Dr. Devinsky opined
that plaintiff should "[a]void extremes in temperature, avoid
dust, fumes, gas and chemical hazards" and the ALJ improperly
"insert[ed] the word 'concentrated' into his paraphrase of Dr.
Devinsky's opinion" (Pl. Memo. at 23).

Plaintiff misstates the record.  The ALJ paraphrased
Dr. Devinsky's opinion correctly and did not include the word
"concentrated" (Tr. 25).  In fact, the ALJ paraphrased this
opinion almost word-for-word from what is stated in plaintiff's
motion papers:

> Dr. Devinsky . . . opined on August 17, 2016 that due
> to [plaintiff's] seizure disorder, he does not need
> more supervision than an unimpaired worker, but that he
> cannot work at heights, with power machines, or operate
> a motor vehicle.  [Plaintiff] should avoid extremes in
> temperature, dust, fumes, gases, and chemical hazards.
> He also opined that [plaintiff] is capable of low
> stress work.  The undersigned gives this opinion some
> weight.

56

(Tr. 25). In all likelihood, plaintiff is referring to the ALJ's RFC finding in which the ALJ stated that plaintiff "must also avoid concentrated exposure to dust, fumes and noxious gases" (Tr. 23).

First, an ALJ is not required to adopt a treating's physician's opinion verbatim in his RFC analysis so long as his RFC finding is supported by substantial evidence, as it is here. See Stewart v. Berryhill, 16 Civ. 4940 (CS)(JCM), 2017 WL 2992504 at *1 (S.D.N.Y. July 14, 2017) (Seibel, D.J.) ("the RFC determination is the Commissioner's decision under the applicable regulations, so it need not parrot the finding of any particular doctor"). Second, plaintiff fails to explain how the omission of the word "concentrated" would have changed the ALJ's disability determination.[20] The VE testified that a person with plaintiff's

---

[20]Plaintiff cites Forrest v. Colvin, 15 Civ. 1573 (KPF), 2016 WL 3528191 (S.D.N.Y. June 22, 2016) (Failla, D.J.), which provides some support for his position. However, Forrest v. Colvin is distinguishable here. In that case, the ALJ specifically relied on a consultative physician's opinion that a plaintiff could engage in light exertional work so long as she avoided "concentrated exposure to dust, fumes, gases, extreme temperatures and allergens" as a reason to reject the opinion of plaintiff's treating physician because it was inconsistent with the consultative physician's findings. 2016 WL 3528191 at *9-*13. However, the consultative physician's report never mentioned the word "concentrated." 2016 WL 3528191 at *9-*13. The Honorable Katherine Polk Failla, United States District Judge found that because of this error, this was not a "good reason" for the ALJ's rejection of the treating physician's opinion. 2016 WL 3528191 at *13. Judge Failla further found that "the ALJ's addition of the word 'concentrated' before the list of irritants [p]laintiff must avoid may have significantly impacted
(continued...)

nonexertional limitations could perform work as a mail clerk,
office helper, housekeeper and marker (Tr. 29). With the excep-
tion of potentially a housekeeper, none of the aforementioned
positions would require "exposure to dust, fumes and noxious
gases." Thus, remand is not warranted.[21]

IV. Conclusion

Accordingly, for all the foregoing reasons, the
Commissioner's motion for judgment on the pleadings is granted

---

[20](...continued)
his decision not to call a vocational expert and, ultimately, his
'not disabled' finding." 2016 WL 3528191 at *13.

Thus, Forrest's rationale is inapplicable here because (1)
the ALJ did not improperly mis-characterize Dr. Devinsky's
opinion, (2) the ALJ did not specifically rely on Dr. Devinsky's
opinion to reject the opinion of another treating physician and
(3) the ALJ called and specifically relied on a VE's testimony.
See Stewart v. Berryhill, 16 Civ. 4940 (CS)(JCM), 2017 WL 9534748
at *22 (S.D.N.Y. June 23, 2017) (McCarthy, M.J.) (no error where
a doctor's report stated that plaintiff "should avoid smoke,
dust, or other known respiratory irritants" and the ALJ added the
word "concentrated" to his RFC) (Report & Recommendation),
adopted at Stewart v. Berryhill, supra, 2017 WL 2992504 at *1 n.2
(noting how the underlying facts of that case were
distinguishable from Forrest).

[21]Plaintiff also argues that the testimony of the VE was
"flawed" because the hypotheticals proffered to him were
"inaccurate and incomplete" (Pl. Memo. at 24). However,
plaintiff's only substantive argument to support this assertion
is that the ALJ's "credibility determination and RFC
determinations [were] deficient" (Pl. Memo. at 24). As discussed
at length above, the ALJ's credibility and RFC determinations
were proper and supported by substantial evidence. Thus, the
hypotheticals posed to the VE were proper and his testimony was
not flawed.

and plaintiff's motion is denied.  The Clerk of the Court is respectfully requested to mark D.I. 13 and D.I. 16 closed, and respectfully requested to close the case.

Dated:  New York, New York
        March 25, 2019

                              SO ORDERED


                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to

All Counsel